## NAT G. SNIPES v. ARCH J. WOOD.

(Filed 24 March, 1920.)

**1. Register of Deeds—Marriage License—Statutes—Penalty—Uncontradicted Evidence—Questions of Law.**

Where the facts are not disputed in an action against a register of deeds to recover the penalty for his failure to make a reasonable enquiry as to impediments to a marriage for which application for license is made to him, Revisal, sec. 2090, the reasonableness of the enquiry may become a matter of law for the Court.

**2. Same—Reasonable Enquiry—Affidavit of Prospective Groom.**

It is not of a sufficient or reasonable enquiry, under the provisions of the Revisal, sec. 2090, as a matter of law, for the register of deeds to issue a marriage license for a woman under eighteen years of age without the consent of her father, being thirteen years old, upon the examination of the prospective bride and groom, whom he did not know and had never seen before, and a third person, whom he had seen a time or two, the first time about two weeks before, and whose character he did not know or enquire into, and erroneously assumed to be good, and that the woman was of the required age judging by her appearance; and the fact that he had required an affidavit from the prospective groom, and interested party, does not affect the result.

BROWN, J., dissenting.

APPEAL by plaintiff from *Guion, J.,* at November Term, 1919, of WAKE.

This case, as stated in the record, is as follows, it being necessary to set out the evidence, as there was a directed verdict.

The plaintiff brought this suit to recover the penalty of $200 for the unlawful issuing of a marriage license, resulting in a marriage between plaintiff's 13-year-old daughter and one Louis Zapantas, a Greek. Plaintiff further contended that the said marriage license was issued without his written consent, and that the defendant did not make reasonable inquiry as to whether there was legal impediment to said marriage.

The defendant contended that he did make reasonable inquiry, and that he did all that the law contemplated. Nat Snipes, witness for himself, testified: I have lived in Durham, N. C., all my life. Leora Snipes is my daughter. She was 14 years old 18 June, 1918, and was born in 1904, 18 June. She is now married to Louis Zapantas, a Greek. She married against my consent. I saw Arch J. Wood soon after the marriage and he said he issued the license on Zapantas' statement; that he did not know him at the time he issued the license. Leora Snipes' age was in the Bible. The Bible from which I took her age has been destroyed. She wore short dresses and did not weigh over 90 or 100 pounds. Cross-examined: My wife does not live with me. She left and went to Baltimore. I never gave my daughter a certificate to work in the factory. She worked in the factory, and I got $10 of her wages on one occasion and gave it to my wife, the factory would not pay her. I was in Virginia working at the camps and didn't know anything about my daughter working until I returned home. Plaintiff offered record of judgment in case of *S. v. Zapantas* as being some evidence tending to corroborate plaintiff. Defendant objects; objection sustained, and plaintiff excepts. The record shows that Louis Zapantas entered a plea of *nolo contendere,* being charged with marrying Leora Snipes, a female, under the age of 14, plea accepted by State.

Arch J. Wood, witness for himself, testified: In May, 1918, I was register of deeds for Wake County. I served four years, and prior to that time had served as deputy under Mr. Charles Anderson. When I was register of deeds Mr. W. H. Penny was my deputy, and he is now serving as register of deeds of Wake County. On 23 May, 1918, I issued marriage license to Louis Zapantas and Leora Snipes. On the morning of 24 May, 1918, I remember it, one J. W. Hunter of Chapel Hill, a man who had previously been in the register of deeds' office, came in with the young Greek and a young lady. The young lady seemed to be well developed and full grown, and applied for marriage license, and Mr. Hunter stated that he knew both parties, and that they were from Norfolk, and he simply brought them there for the purpose of introducing them. He ran an automobile for hire. He had previously been in my office, and I knew his face, and he told me he was there a week or two ago with other parties to get license, and I inquired of Mr. Hunter if he knew both parties, and he stated that he knew they were of legal age, and he said he believed them both to be more than 18 years of age. I questioned the Greek very closely, and asked him how long he had been knowing the young lady, and if he knew her to be 18 years old, and he stated that from his best information he believed her to be 18 years old, and he also stated that the young lady's parents knew that both he and she were engaged to be married, and that it was agreeable to all. He stated that the young lady's parents both lived in Norfolk. I also questioned the young lady separately and apart from the other two parties. I did not try to keep the other parties from hearing me. She was sitting to one side and I asked her the date of her birth, and she stated that she was 18 years old in June, 1917, and I made a record on the marriage license to that effect at that time. I also asked her if her parents knew that she was going to get married, and she said that they did, and that it was agreeable. She stated that her parents lived in Virginia. She then stated that the laws of Virginia required her to be 21 years of age, and the laws of North Carolina only required her to be 18, and that it was the reason that she was getting married here.

The Greek stated that the reason he was getting married here was because he was going to work in a restaurant in Raleigh. He also stated that it was perfectly agreeable to both parties; I made all the inquiries I knew how to make both from the parties who introduced themselves, and also from J. W. Hunter, who witnessed the marriage. I married them, and was at that time a justice of the peace. I had known Mr. Hunter something like three or four weeks. I had seen him on the streets several times, and he had been in my office once something like three or four weeks before that time. I thought Mr. Hunter was a reliable man. No statement he had ever made to me had proven to be untrue.

The paper which you hand me is the license I issued at that time, and is witnessed by W. J. Hunter, W. H. Penny, and C. T. Bailey, who were in the office at that time. I properly swore the Greek, and, as far as I knew, there was no legal impediment to the marriage at that time. Leora Snipes said that she was 18 years of age in June, 1917, and I made a record of that on the stub, and this is it. Cross-examined.

I did not know either one of the parties that morning when they came to my office. I had no reason to doubt her age as she seemed to be well grown and fully developed, and weighed about 125 pounds. I do not know that the girl would not weigh over 90 pounds. I did not know the character of Mr. Hunter in the community in which he lives. I do not know whether Hunter has ever served time on the roads of Durham County under a sentence. I never saw any one around Raleigh or anywhere else who told me what kind of man Hunter was. The first time I ever saw him according to my best recollection was about three or four weeks previously to issuing the license. I know every one called him Tank. I relied upon the statement of all three, Hunter, Zapantas, and Leora Snipes. I had seen Hunter several times before he came to my office. He told me that he did not live in Raleigh, and I knew no one in Raleigh who did know him. I do not know anything about Mr. Hunter's character. I supposed he was running an automobile for hire. I had seen him with them when he was over here. I asked Hunter where he lived the day that I issued license, and he said that he lived in Chapel Hill, N. C. He also told me that he ran an automobile for hire when he was in my office before. Hunter told me that Zapantas and wife lived in Norfolk.

The marriage license was offered in evidence. At the foot of the license is the following: Louis Zapantas, being duly sworn, says: That the parties for license are of lawful age, *i. e.,* both being over 18 years of age, and so far as he is informed and believes, there is no lawful cause or impediment forbidding said marriage.

                                        LOUIS ZAPANTAS.

Sworn and subscribed to before me, this 23 May, 1918.

                                        ARCH J. WOOD.

It is then stated that the parties were married by Mr. Wood, as justice of the peace, on 23 May, 1918, at Raleigh.

W. H. Penny, witness for defendant, testified: I am register of deeds of Wake County. I was chief deputy for Arch J. Wood, register of deeds in 1918, and had been in the office since 1 January, 1902. I was present when Zapantas and Leora Snipes applied for marriage license. We question and take notice of these Virginia couples because we have so many to come, and they cannot marry in Virginia until they are 21,

and they come over here from every place in Virginia. Mr. Hunter said he knew the parties well; that he was a nice Greek and a gentleman. Mr. Wood made inquiry and said to me, "What would you do in this case?" I said the girl looked to me to be 18 years old, and I went over and asked the young lady myself. I said: "Miss Snipes, how old are you? Have you run away from Norfolk with this man?" She said her parents knew it, and she could not marry in Virginia. I asked her when she was born, and she said in June, 1900. I said, "How old are you?" and she said, "18 in June, 1917." Mr. Wood asked me what would I do, and I said: "I would write them, and would have done so some time ago. Mr. C. T. Bailey was in there in addition to six other clerks. Wood asked them their ages, and they said they lived in Norfolk and could not get married there and came down here. I saw Mr. Wood when he administered the oath. Cross-examined: Q. Why did you not swear the man who brought them down and recommended them? We swear the man who applies for license, regardless of what their ages are. We always question parties from Virginia, and we can catch them by asking them the year of birth. Case for defendant.

O. L. Parham testifies as follows for plaintiff: I know the general character of Nat Snipes, and it is good. I have not known him recently. All I have heard regarding his character is that it is good. Cross-examined. I have been deputy sheriff of Wake County for about 21 years. I knew Mr. Snipes when he lived in Wake County about 20 years ago. Since that time he has been living in Durham County.

W. H. Penny, recalled for further examination: I made inquiry as to the girl's age, and she said she was born in June, 1900, and this would make her 18 years old. She married in May, 1918. I said 1900. She must have said 1898. We would not have written the license if she had said 1900.

At the conclusion of all the evidence, counsel for plaintiff moved the court for a verdict and judgment in favor of plaintiff, which was refused, and plaintiff excepted.

It was stated by the court that if plaintiff would withdraw contradictory evidence as herewith set out in record he would then direct a verdict, as a matter of law. At the close of the evidence in the cause, counsel for the plaintiff withdrew from the jury so much of the testimony of the plaintiff as relates to the statement made by the defendant as to the issuance of the license upon inquiry only of Louis Zapantas, and further consent and agree that the testimony of the witness, W. H. Penny, conflicting as to the dates between 1899 and 1900, may be corrected to the end that this testimony shall appear to be, that the statement by Leora Snipes was that she was born in 1899, and that she was over the age of 18 in May, 1918, at the time of the issuance of the license, and with

these corrections, counsel for plaintiff submitted to the court by consent and agreement that if upon all the testimony the court should be of the opinion as a matter of law, the plaintiff is entitled to recover, judgment shall be entered for the plaintiff, but that if, on the other hand, upon the whole evidence the court shall be of the opinion, as a matter of law, that the plaintiff is not entitled to recover, then judgment shall be entered in the action for the defendant.

Upon this agreement in open court, the court being of the opinion, as a matter of law, that the defendant did not issue said license knowingly and without reasonable inquiry as to the legal impediment of age to the marriage of said parties, it is adjudged that the plaintiff is not entitled to recover, to which plaintiff excepted and appealed.

*J. W. Barbee and A. J. Templeton for plaintiff.*
*Herbert E. Norris and J. M. Broughton for defendant.*

WALKER, J., after stating the case: The plaintiff admitted the facts to be as testified by the defendant and his witness, W. H. Penny, and the question of due inquiry by the defendant before issuing the marriage license therefore became one of law. We are of the opinion that there was error, unless we are to overrule the many previous decisions of this Court upon this subject. The cases, or a majority of them, will be found in *Gray v. Lentz,* 173 N. C., 346, where the law is fully stated. The Court said in *Williams v. Hodges,* 101 N. C., 303: "The license shall not be issued as of course to any person who shall apply for it. The register is charged to be cautious, and to scrutinize the application; it must appear probable to him, upon reasonable inquiry when he has not personal knowledge of the parties, that the license may and ought to be issued. The probability upon which the register should act is not such as arises from conjecture, . . . but from inquiry of trustworthy persons known to the register, who can and do give pertinent information." And in *Trolinger v. Boroughs,* 133 N. C., 315: "While we may not prescribe any rule for the guidance of the register, it would seem that 'reasonable inquiry' involves at least an inquiry made of, or information furnished by, some person known to the register to be reliable, or, if unknown, identified and approved by some reliable person known to the register. This is the rule upon which banks act in paying checks, and surely in the matter of such grave importance as issuing a marriage license the register should not be excused upon a less degree of care." The case of *Cole v. Laws,* 104 N. C., 651, is equally emphatic in stating the correct principle in such instances. It is there held that "When a register of deeds issues a license for the marriage of a woman under 18 years of age, without the assent of her parents, upon the appli-

cation of one of whose general character for reliability he was ignorant, and who falsely stated the age of the woman, without making any further inquiry as to his sources of information: *Held,* that he had not made such reasonable inquiry into the facts as the law required, and he incurred the penalty for the neglect of his duty in that respect." In *Morrison v. Teague,* 143 N. C., 186, it was likewise held that, "In an action against a register of deeds to recover the penalty under Rev., 2090, for issuing a marriage license contrary to its provisions, where the uncontradicted evidence showed that the register took the word of the prospective bridegroom and his friend, neither of whom he knew, as to the age of the young lady, and made no further inquiry of any one, the court should have given the plaintiff's prayer for instruction, that as a matter of law defendant failed to make reasonable inquiry as to the age of the plaintiff's daughter." The present *Chief Justice* said in *Laney v. Mackey,* 144 N. C., 634: "The application was made by a man whose name was not known to the defendant, whom he does not show to have been trustworthy, and as to whom the only evidence is that his general character is bad. Such inquiry as the defendant made in this case was not reasonable. It was purely perfunctory and did not furnish the security against a violation of the law requiring a proper observance of the requirements of the statute."

The Court said in *Agent v. Willis,* 124 N. C., 29: "The defendant seemed to think that an oath on the part of anybody was all that was necessary to authorize him to issue the license. But the character of the witness and accuracy of information are the things that the register of deeds should look to when he issues a license for marriage, in case where there is doubt about the age of the parties."

While the decisions cited so far are all clearly pertinent and furnish a strict analogy to this case, the language of *Justice Brown,* in *Morrison v. Teague,* 143 N. C., 186, also clearly applies, and is very persuasive, and, as we deem, controlling: "The learned counsel for the defendant, Mr. Gwaltney, most earnestly contended in his argument that upon a fair interpretation of the words 'reasonable inquiry,' the charge of his Honor should be sustained. Notwithstanding we find ourselves unable to reconcile this view with very recent decisions of this Court, we agree with counsel that upon the evidence in the record the question was one of law, and that his Honor was correct in so holding. The uncontradicted evidence shows that the register took the word of the prospective bridegroom and his friend as to the age of the young lady, and made no further inquiry of any one; that the register did not know either Kennedy or his friend. The register's suspicion seems to have been aroused, for he inquired why they applied for license in Taylorsville, as the girl lived in Iredell; nevertheless, he made no further inquiry."

*Justice Connor* said, in *Furr v. Johnson,* 140 N. C., 157: "It would seem that 'reasonable inquiry' involves at least an inquiry made of, or information furnished by, some person known to the register to be reliable, or, if unknown, identified and approved by some reliable person known to the register."

The case of *Joyner v. Harris,* 157 N. C., 295, is in some respects much like our case. The prospective bridegroom and his friend, and brother, who gave information to the register of deeds were both of good appearance. The register stated that he thought from their looks that they were trustworthy, and would not get him in trouble. They certainly made a very good impression on him by their frankness and general demeanor. As to this case we said, in *Gray v. Lentz, supra:* "The case of *Joyner v. Harris,* 157 N. C., 295, while in some respects not like this one, is yet, in principle, not unlike it. It referred to the rule which, as we have said, had been settled for some time in several decisions of the Court, that the register should have some reliable information before he issues the license, and not act blindly or too confidingly upon the statements of mere strangers, and especially those who are directly interested and under a strong temptation to falsify, as here. We adopted and applied the familiar rule formulated in previous cases, and held that sufficient inquiry had not been made. It is true that in *Joyner v. Harris* we treated the information given as to her age as practically a statement of the girl herself; but the case is otherwise decisive of this one. It was there said: 'If we should hold that a register of deeds can satisfy himself as to the essential facts upon such an inadequate investigation as was made in this case, we would defeat the very object and purpose of the statute to throw safeguards about the young and inexperienced, who would by reason of their youthful impulses be liable to enter into so solemn and serious a relation lightly and unadvisedly and not soberly, discreetly, and reverently, as they should do, and as the best interests of society require to be done.' The fact that the register administered an oath to the applicant and his friend does not, of itself, exonerate him. He is permitted by the statute to do so, that he may the better elicit the facts, and his doing so or failing to do so would be but a circumstance for the jury to consider."

Now, applying these authorities, which seem to be uniform, to the facts of this case, the girl was under fourteen years of age. She came to the register's office on 24 May, 1918, accompanied by her lover, Louis Zapantas, and J. W. Hunter, who was represented as their friend. Hunter has been in the office once before, about a week or two before that day, on a similar errand, to get a license for another couple who were with him, and the register was told by him that he had been there on that occasion, and by this the register "knew his face." Hunter

stated to the register that he knew both parties, Louis Zapantas and his female companion, were of legal age, and "from his best information" he believed the girl to be 18 years old; that her parents knew of the engagement to be married, and approved it, and that her parents lived in Norfolk, Va. The register also questioned the girl, and she stated in substance the same thing, and that she was 18 years old in June, 1917. Asked why she came here to be married, she replied that according to the laws of Virginia, she had to be 21 years old. The Greek said he came here for the marriage because he expected to open a restaurant in Raleigh. The register testified that "he did not know either one of the parties that morning when they came to his office," but he had no reason to doubt the girl's age, as she seemed to be well grown and fully developed and weighed over 125 pounds. As to Hunter, the register said that "he did not know his character in the community in which he lived (Chapel Hill), and that no one had ever told him what kind of man Hunter was," and he further said: "I did not know the character of Mr. Hunter in the community in which he lives. I do not know whether Hunter has ever served time on the roads of Durham County under a sentence. I never saw any one around Raleigh or anywhere else who told me what kind of man Hunter was. The first time I ever saw him according to my best recollection was about three or four weeks previously to issuing of license. I know every one called him Tank. I relied upon the statements of all three, Hunter, Zapantas, and Leora Snipes. I had seen Hunter several times before he came to my office. He told me that he did not live in Raleigh, and I knew no one in Raleigh who did know him. I do not know anything about Mr. Hunter's character. I suppose he was running an automobile for hire." Hunter stated that he knew the parties well, and that Zapantas was a nice Greek and a gentleman. Defendant asked his deputy, W. H. Penny, what he would do, and the latter replied, "I would write them, and would have done so some time ago." The Greek was the only person who was sworn. This recital of the main facts in evidence does not present as strong a case for the defendant as some of those we have cited, where this Court held that there was not due inquiry, and if the facts herein are carefully compared with those set forth in the cases cited, this will more clearly appear. A register may expect that the evidence of the interested parties will not generally be reliable, and that it is unsafe to confide in it, where the parties are unknown to him and their characters are not shown by some responsible person who does know them. How this wayward couple happened to fall in with Hunter, who lived in Chapel Hill, many miles from Norfolk, Va., is not satisfactorily shown. They evidently had only a chance acquaintance, and we think the circumstances should have put a wary man on his guard. The character of Hunter was not

known to the register. He had seen him once before in his office, and casually on the streets of Raleigh three or four times, but it was only to see him. The circumstances were at least suspicious, and should have induced the defendant to have acted more guardedly. The defendant was himself doubtful, for he asked for the advice of another as to what should be done. He clearly has not brought his defense within the rule we have so often applied in such cases, and which, as stated above, is that he should not have relied upon what was said by a person whose character and responsibility was not known to him, or vouched for by some one who was known, or unless there are other circumstances from which he can form a reliable judgment as to the facts. Here there was really nothing upon which to base a decision, except the statements of the interested parties, and that of Hunter, who manifestly got his information from them, if he had any at all, and that is really what he testified. He did not pretend to know the girl's parents or to have ever even been with them, or where he could have acquired any knowledge of the facts, except from the parties themselves. He did not conceal his ignorance of the facts even adroitly, but very clumsily, and so acted as to arouse a keen suspicion as to the truth of his statements. It is to be noticed that Hunter never answered defendant's questions directly and fully, but evasively, and he never said where he got his information, nor did the Greek answer any more fully. We do not know where he got it unless from the girl. Will this do, under the statute? If so, it might as well be repealed, as being of no protection whatever to girls of tender years who are prone to act imprudently and unwisely in such important matters, and to decide impulsively, rather than deliberately, upon a question which so vitally concerns their future welfare and happiness, and we know what is generally the unfortunate result. It was partly to prevent this misfortune that the statute was passed. We should, therefore, be very careful to see that the intention of the Legislature is properly executed, and that no license is issued until after reasonable inquiry. It appears in this record that the man was indicted for marrying this girl, who was five years under the required age, and that he pleaded *nolo contendere,* thereby virtually confessing his criminal wrong. We are not basing any part of our decision on this fact, as the evidence of it was ruled out, but merely refer to it incidentally as showing how boldly and recklessly a man will commit two crimes to accomplish his purpose in such cases, and how essential it is that our officers, charged with the duty of issuing marriage licenses, should require some *reliable* evidence of the woman's age, and not trust to the statements of the parties, and some casual and accomodating outsider, whose character is not known, and who, in the generality of cases, as our records surely attest, proves to be utterly irresponsible and untrustworthy. That the defendant in this

case acted honestly, and with the very best of intentions, we have not the least doubt, and, if he had followed his own first impression, he would have acted more wisely and considerately. The parties should have been required to furnish more reliable proof of the facts than they did, or go somewhere else where they were better known, as that which they did offer was, at least, suspicious, and the truth thinly veiled. We regret the result, but we are bound to enforce the law as construed by a long line of our decisions, extending back almost to the day when the statute was enacted.

This case is a striking illustration of the necessity for a strict compliance with the statute, as we have construed it. Practically everything these people told the register was false, and knowingly false, and the violation of the law by the parties resulted from not requiring at least some reliable or trustworthy information as to the facts, instead of confiding in Hunter, whose very admission and conduct showed that he was not speaking with any knowledge of them. This case is as clear as any we have cited, if not clearer than any.

We must reverse the decision of the judge if we follow our cases, and direct that judgment be entered in the court below for the plaintiff, according to the agreement, and it will be so certified.

Reversed.

BROWN, J., dissenting.